**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| KHONG MENG CHEW, derivatively on behalf of MONEYGRAM INTERNATIONAL, INC., | |
| Plaintiff, | |
| vs. | Civil Action No.: _____ |
| W. ALEXANDER HOLMES, PAMELA H. PATSLEY, LAWRENCE ANGELILLI, J. COLEY CLARK, VICTOR W. DAHIR, ANTONIO O. GARZA, SETH W. LAWRY, MICHAEL P. RAFFERTY, GANESH B. RAO, W. BRUCE TURNER, and PEGGY VAUGHAN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MONEYGRAM INTERNATIONAL, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Khong Meng Chew ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant MoneyGram International, Inc. ("MoneyGram" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants W. Alexander Holmes, Pamela H. Patsley, Lawrence Angelilli, J. Coley Clark, Victor W. Dahir, Antonio O. Garza, Seth W. Lawry, Michael P. Rafferty, Ganesh B. Rao, W. Bruce Turner, and Peggy Vaughan (collectively, the "Individual Defendants," and together with MoneyGram, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of MoneyGram, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's

complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MoneyGram, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by MoneyGram's directors and officers.

2.      MoneyGram is a global provider of money transfer services.  The Company also provides bill payment services, issues money orders, and processes official checks in the U.S. and in select countries and territories.  The Company primarily offers its services through third-party agents and digital solutions.

3.      On October 20, 2009, the Federal Trade Commission ("FTC") issued a press release announcing that MoneyGram was to pay $18 million to settle FTC charges that the Company allowed its money transfer system to be used by fraudulent telemarketers to cheat U.S. consumers out of tens of millions of dollars.  The press Release also noted that an agreed-upon court order (the "Order") settling the FTC's charges required MoneyGram to, *inter alia*, implement a comprehensive anti-fraud program.

4.      In November 2012, the Company reached a settlement with the U.S. Attorney's Office for the Middle District of Pennsylvania ("MDP") and the U.S. Department of Justice

("DOJ"), Criminal Division, Money Laundering and Asset Recover Section concerning an investigation of transactions involving certain of the Company's U.S. and Canadian agents, fraud complaint data, and the Company's consumer anti-fraud program from 2003 to 2009.  As part of this settlement, the Company entered into a Deferred Prosecution Agreement (the "DPA") with the MDP and the DOJ.

5.      Under the DPA and the Order, the Company was required to take actions to enhance its compliance program.  If MoneyGram fails to comply with the DPA or Order, it could face criminal prosecution, civil litigation, significant fines, damage awards and/or regulatory consequences.

6.      On June 22, 2018, the Company received a request for production of documents from the New York Department of Financial Services ("NYDFS") related to the misconduct underlying the DPA and the Order.  The request for production of documents followed inquiries by the NYDFS concerning certain of the Company's New York based agents.

7.      On November 8, 2018, the FTC issued a press release announcing that the Company agreed to pay $125 million to settle allegations that MoneyGram violated the Order with the FTC and breached the DPA.

8.      On this news, the price per share of MoneyGram common stock fell $2.20, or approximately 49.2%, from the previous day's closing price, closing at $2.27 per share on November 9, 2018.

9.      Since at least 2003, the Individual Defendants caused the Company to engage in a scheme consisting of, *inter alia*: (1) allowing high levels of fraud and suspicious activities for years involving its money transfer system and certain agents; (2) failing to implement necessary anti-fraud countermeasures; (3) engaging in such practices in order to, *inter alia*, avoid adverse

effects on the Company's revenue; (4) failing to properly vet its agents; and (5) failing to provide adequate training on detecting and preventing consumer fraud (the "Fraudulent Misconduct").

10.     Moreover, Individual Defendants caused the Company to fail to maintain internal controls.

11.     From at least February 11, 2014 through the present (the "Securities Fraud Relevant Period"), the Individual Defendants made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

12.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact to the investing public.

14.     Furthermore, during the Securities Fraud Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations while two of them engaged in insider sales, netting proceeds of over $203.8 million. Approximately 3.13 million shares of the Company's common stock were repurchased at inflated prices between July 2014 through December 2016, inclusive, for over $28.7 million. As the Company's common stock was actually only worth $2.27 per share, the price at which it closed on November 9, 2018, the Company overpaid approximately $21.6 million in total.

15.     In light of the Individual Defendants' misconduct, which has subjected MoneyGram, its Chief Executive Officer ("CEO"), its former CEO, and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of Illinois (the "Securities Class Action"), the need to undertake internal investigations, the Company's being the subject of internal and outside investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the MoneyGram Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the

Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation with headquarters in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of MoneyGram common stock. Plaintiff has continuously held MoneyGram common stock at all relevant times.

### Nominal Defendant MoneyGram

24.     MoneyGram is a Delaware corporation with its principal executive offices at 2828 N. Harwood Street, 15th Floor, Dallas, Texas 75201. MoneyGram common stock trades on the NASDAQ Global Select Market under the ticker symbol "MGI."

**Defendant Holmes**

25.     Defendant W. Alexander Holmes ("Holmes") has served as MoneyGram's CEO since January 2016 and as Chairman of the Board since February 2018.  He previously served as the Company's Executive Vice President, CFO and Chief Operating Officer beginning in February 2014.  According to the Company's Schedule 14A filed with the SEC on April 2, 2018 (the "2018 Proxy Statement"), as of March 8, 2018, Defendant Holmes beneficially owned 424,593 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Holmes owned over $4.52 million worth of MoneyGram stock.

26.     For the fiscal year ended December 31, 2017, Defendant Holmes received $4,275,806 in compensation from the Company. This included $725,000 in salary, a $450,000 bonus, $2,175,006 in stock awards, $915,000 in non-equity incentive plan compensation, and $10,800 in all other compensation.

27.     The Company's 2018 Proxy Statement stated the following about Defendant Holmes:

**W. Alexander Holmes,**[1] 43, Director since 2015

Mr. Holmes has served as CEO of the Company since January 1, 2016 and Chairman of the Board since February 2, 2018. Prior to that, Mr. Holmes was Executive Vice President, CFO and Chief Operating Officer of the Company since February 2014 and Executive Vice President and CFO since March 2012. He joined the Company in 2009 as Senior Vice President of Corporate Strategy and Investor Relations. From 2003 to 2009, Mr. Holmes served in a variety of positions at First Data Corporation, including chief of staff to the Chief Executive Officer, Director of Investor Relations and Senior Vice President of Global Sourcing & Strategic Initiatives. From 2002 to 2003, he managed Western Union's Benelux region from its offices in Amsterdam.

*Director Criteria:*   Mr. Holmes leads the Company as the CEO and brings to the Board extensive knowledge of the Company and its strategy gained through his

---

[1] Emphasis contained in original throughout, unless otherwise noted.

demonstrated leadership and performance in all aspects of our business. Through his numerous executive positions at the Company and in other roles in the payment services industry, Mr. Holmes has experience in business operations, finance, international business and strategy development.

**Defendant Patsley**

28.     Defendant Pamela H. Patsley ("Patsley") served as the Company's Chairman and CEO from September 2009 to December 2015 and as the Company's Executive Chairman from January 2016 to February 2018.  She also served as a Company director from 2009 to February 2018.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Patsley beneficially owned 1,834,080 shares of the Company's common stock, which represented 3.3% of the Company's outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Patsley owned over $19.53 million worth of MoneyGram stock.

29.     For the fiscal year ended December 31, 2017, Defendant Patsley received $4,485,407 in compensation from the Company. This included $650,000 in salary, a $1,625,000 bonus, $1,462,507 in stock awards, $737,100 in non-equity incentive plan compensation, and $10,800 in all other compensation.

30.     The Company's Schedule 14A filed with the SEC on April 27, 2017 stated the following about Defendant Patsley:

**Pamela H. Patsley,** 60, Director since 2009

Ms. Patsley has been Executive Chairman of the Company since January 1, 2016. Ms. Patsley was Chairman and CEO of the Company from September 2009 to December 2015 and Executive Chairman of the Company from January to September 2009. Prior to that, Ms. Patsley served as Senior Executive Vice President of First Data Corporation, a global payment processing company, and from May 2002 to October 2007, Ms. Patsley served as President of First Data International. From 1991 to 2000, Ms. Patsley served as President and Chief Executive Officer of Paymentech, Inc., prior to its acquisition by First Data Corporation. Ms. Patsley also served as Chief Financial Officer of First USA, Inc.

She currently serves as a director of Texas Instruments, Inc., a semiconductor design and manufacturing company; Hilton Grand Vacations Inc., a timeshare and resorts management company; and Dr Pepper Snapple Group, Inc., a beverage company.

*Director Criteria:*   Ms. Patsley brings to the Board a wealth of knowledge and expertise, as well as leadership experience, that she gained through numerous executive positions that she has held throughout the years, including serving as Chief Executive Officer, Chief Financial Officer and president of various companies in the payment services industry. Through these roles she has also gained experience in the area of international business. In addition, Ms. Patsley's service as a director at several public companies throughout the years has provided her with unique insights into various industries and issues facing boards.

### Defendant Angelilli

31.     Defendant Lawrence Angelilli ("Angelilli") has served as the Company's CFO since January 2016.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Angelilli beneficially owned 122,477 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Angelilli owned over $1.3 million worth of MoneyGram stock.

32.     For the fiscal year ended December 31, 2017, Defendant Angelilli received $1,394,689 in compensation from the Company. This included $398,077 in salary, $675,012 in stock awards, $310,800 in non-equity incentive plan compensation, and $10,800 in all other compensation.

33.     The Company's website states the following about Defendant Angelilli:

Larry Angelilli was named Chief Financial Officer in January 2016. As the company's principal financial officer, he oversees all finance, accounting and treasury related functions including investor relations.

Mr.  Angelilli joined MoneyGram in August  2011 as  Senior  Vice  President, Treasurer, bringing more than 30 years of financial services and treasury experience to the company. In that role he was responsible for MoneyGram's global banking and treasury operations and leading the company's corporate finance functions.

Prior to MoneyGram, he was Director, Underwriting for Hudson Advisors/Lone Star Funds where he was responsible for the underwriting of private equity acquisitions related to financial asset pools, and distressed financial institutions. From 1998 to 2009, Angelilli was Senior Vice President, Finance at Centex Corporation. His professional experience also includes tenures with NationsBank Corporation, Chrysler Financial Corporation and The National Bank of Detroit.

Mr. Angelilli holds a Master of Business Administration from the University of Detroit and a Bachelor of Arts in Economics from Wayne State. [sic] University.

**Defendant Clark**

34.     Defendant J. Coley Clark ("Clark") has served as a Company director since 2010. He also serves as Chair of the Human Resources and Nominating Committee. According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Clark beneficially owned 62,817 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Clark owned over $669,001 worth of MoneyGram stock.

35.     For the fiscal year ended December 31, 2017, Defendant Clark received $245,017 in compensation from the Company. This included $120,000 in fees earned or cash paid and $125,017 in stock awards.

36.     The Company's 2018 Proxy Statement stated the following about Defendant Clark:

**J. Coley Clark,** 72, Director since 2010

Mr. Clark is the retired Chief Executive Officer and Chairman of the Board of BancTec, Inc., a global provider of document and payment processing solutions. Prior to his retirement in December 2016, he was Co-Chairman of the Board (from 2014 to December 2016) and Chairman of the Board and Chief Executive Officer of BancTec, Inc. (from September 2004 to 2014). In 2004, Mr. Clark retired from Electronic Data Systems Corporation, or EDS, an outsourcing services company that was acquired by Hewlett-Packard in 2008, as Senior Vice President and head of the Financial and Transportation Industry Group. He joined EDS in 1971 in the Systems Engineering Development Program and progressed through a variety of technical, sales and management roles related to the financial and insurance industries. He assumed responsibility for the Financial Industry Group in 1986 and

was named a corporate officer in 1989. Mr. Clark was appointed a Senior Vice President in 1996 and served as a member of the Global Operations Council at EDS, which was the senior management group within the company. In addition, Mr. Clark served three years in the U.S. Army, attaining the rank of Captain, and served as a company commander in Europe and Southeast Asia.

*Director Criteria:* Mr. Clark brings over 30 years of experience in the financial industry to the Board. Through his position as Chairman and Chief Executive Officer of BancTec, Inc. and his numerous positions at EDS, Mr. Clark has demonstrated his strong leadership skills and his ability to understand day-to-day operations, as well as the broader strategic issues facing a public company. In addition, Mr. Clark's prior service on public company boards and committees provides him with a broad perspective on various governance and other matters.

**Defendant Dahir**

37.     Defendant Victor W. Dahir ("Dahir") has served as a Company director since 2010. He also serves as Chair of the Audit Committee. According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Dahir beneficially owned 57,817 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Dahir owned over $615,751 worth of MoneyGram stock.

38.     For the fiscal year ended December 31, 2017, Defendant Dahir received $245,017 in compensation from the Company. This included $120,000 in fees earned or cash paid and $125,017 in stock awards.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Dahir:

**Victor W. Dahir,** 72, Director since 2010

Mr. Dahir worked for Visa U.S.A. Inc. (now Visa Inc.), a global payment technology company, from 1984 until his retirement in 2005, most recently as Executive Vice President, Finance and Administration and Chief Financial Officer of Inovant LLC, a subsidiary of Visa. He served as the Chief Financial Officer of Visa Inc. from 1991 to 2004 and held other positions of increasing responsibility from 1984 to 1991.

*Director Criteria:* Mr. Dahir brings over 40 years of finance and accounting experience to the Board, including serving over 15 years as Chief Financial Officer of Visa Inc. Through these years Mr. Dahir has developed an expertise in financial

services and has gained experience in several other areas that are valuable to the Board, including risk management, technology, legal, relationship management and banking regulation.

**Defendant Garza**

40.     Defendant Antonio O. Garza ("Garza") has served as a Company director since 2012.  He also serves as Chair of the Compliance and Ethics Committee and as a member of the Human Resources and Nominating Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Garza beneficially owned 51,707 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Garza owned over $550,679 worth of MoneyGram stock.

41.     For the fiscal year ended December 31, 2017, Defendant Garza received $245,017 in compensation from the Company. This included $120,000 in fees earned or cash paid and $125,017 in stock awards.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Garza:

**Antonio O. Garza,** 58, Director since 2012

Amb. Garza has served as Counsel in the Mexico City office of White & Case LLP, an international law firm, since 2009. From 2002 to 2009, Amb. Garza was the U.S. Ambassador to Mexico. Prior to that time Amb. Garza served as chairman of the Texas Railroad Commission, having been elected to that statewide office in 1998. Amb. Garza is a past partner at Bracewell & Patterson LLP (now Bracewell) and served as Secretary of State of the State of Texas and Senior Policy Advisor to the Governor of the State of Texas from 1994 to 1997. Amb. Garza currently serves as a director of Kansas City Southern, a railroad company, and Chairman of the Board of Kansas City Southern de México, a subsidiary of Kansas City Southern. Amb. Garza serves on the Board of Trustees of Southern Methodist University.

*Other public company boards served on in the past five years:    Basic Energy Services, Inc. (2009-2016).*

*Director Criteria:    Amb. Garza brings to the Board an extensive government and regulatory background and deep experience with international business, especially in Mexico and Latin America. Amb. Garza also has valuable perspective balancing*

management of initiatives to achieve corporate objectives in highly regulated environments both in the U.S. and Mexico.

**Defendant Lawry**

43.     Defendant Seth W. Lawry ("Lawry") has served as a Company director since 2008. He also serves as a member of the Compliance and Ethics Committee and as a member of the Human Resources and Nominating Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Lawry beneficially owned 23,737,858 shares of the Company's common stock, which represented 42.8% of the Company's outstanding common stock.[2] Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Lawry owned over $252.8 million worth of MoneyGram stock.

44.     The Company's 2018 Proxy Statement stated the following about Defendant Lawry:

**Seth W. Lawry,** 53, Director since 2008

Mr. Lawry is an Advisory Partner of Thomas H. Lee Partners, L.P. and worked at THL from 1989 to 1990, rejoining the firm in 1994 until his retirement in 2016. From 1987 to 1989 and 1992 to 1994, Mr. Lawry worked at Morgan Stanley & Co. Incorporated, a global financial services company ("Morgan Stanley"), in the Mergers & Acquisitions, Corporate Finance and Equity Capital Markets Departments. He currently serves as a director of various private and non-profit institutions.

*Director Criteria:*   Mr. Lawry is one of the Board Representatives designated by THL, as discussed above in "Part Two—Board of Directors and Governance." Mr. Lawry brings over 25 years of finance, banking and managerial experience to the Board that he gained from his positions at THL and Morgan Stanley, including experience in mergers and acquisitions and capital markets. In addition, his service as a director at various public and private companies and non-profit institutions provides him with unique and valuable perspectives that he shares with the Board.

---

[2] Defendant Lawry is a board representatives of Thomas H. Lee Partners, L.P. ("THL"). The total shares listed as beneficially owned by him consists of the 23,737,858 shares of common stock held by funds affiliated with THL.

Verified Shareholder Derivative Complaint

45.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lawry made the following sale of company stock, and made no purchases of Company stock.  On April 2, 2014, before the fraud was exposed, Defendant Lawry sold 12,640,396 Company shares on inside information for $16.12 per share, for which he received over $203.8 million.[3] His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

**Defendant Rafferty**

46.     Defendant Michael P. Rafferty ("Rafferty") has served as a Company director since March 2016.  He also serves as a member of the Audit Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Rafferty beneficially owned 32,939 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Rafferty owned over $350,800 worth of MoneyGram stock.

47.     For the fiscal year ended December 31, 2017, Defendant Rafferty received $225,017 in compensation from the Company. This included $100,000 in fees earned or cash paid and $125,017 in stock awards.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Rafferty:

**Michael P. Rafferty,** 63, Director since March 2016

---

[3] Represents shares held by held by Thomas H. Lee Equity Fund VI, L.P., Thomas H. Lee Parallel Fund VI, L.P., Thomas H. Lee Equity Parallel (DT) Fund VI, L.P., THL Equity Fund VI Investors (MoneyGram), LLC, THL Coinvestment Partners, L.P., THL Operating Partners, L.P. and THL Managers VI, LLC, as well as Great-West Investors, L.P. and Putnam Investments Employees' Securities Company III, LLC.

Mr. Rafferty was a member of Ernst & Young LLP, a global public accounting firm, from 1975 until his retirement in 2013. He was admitted as a Partner of Ernst & Young LLP in 1988 and served as the Audit Practice Leader for the Southwest Region from 2004 until 2013. During his career with Ernst & Young LLP, he primarily served clients in the financial services and healthcare industries. Mr. Rafferty currently serves as a director and chairman of the audit committee of Triumph Bancorp, Inc., a financial holding company with a diversified line of community banking and commercial finance activities. Mr. Rafferty is a Certified Public Accountant licensed in Texas.

*Director Criteria:* Mr. Rafferty brings extensive financial and accounting knowledge and experience in the financial services industry to the Board as a result of his nearly 40-year tenure with Ernst & Young LLP, current service as a director and chairman of the audit committee of another public company and background as a Certified Public Accountant.

**Defendant Rao**

49.     Defendant Ganesh B. Rao ("Rao") has served as a Company director since 2008. He also serves as a member of the Compliance and Ethics Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Rao beneficially owned 23,737,858 shares of the Company's common stock, which represented 42.8% of the Company's outstanding common stock.[4] Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Rao owned over $252.8 million worth of MoneyGram stock.

50.     The Company's 2018 Proxy Statement stated the following about Defendant Rao:

**Ganesh B. Rao,** 41, Director since 2008

Mr. Rao is a Managing Director of Thomas H. Lee Partners, L.P. Mr. Rao worked at THL from 2000 to 2002 and rejoined the firm in 2004 where he has worked since that time. From 1998 to 2000, Mr. Rao worked at Morgan Stanley in the Mergers & Acquisitions Department. Mr. Rao currently serves as a director of Black Knight Financial Services, Inc. a technology and analytics provider to the mortgage and finance industries, and is a director of various private companies.

*Other public company boards served on in the past five years:   Nielsen Holdings N.V. (2013-2014).*

---

[4] Defendant Rao is a board representatives of THL. The total shares listed as beneficially owned by him consists of the 23,737,858 shares of common stock held by funds affiliated with THL.

*Director Criteria:*   Mr. Rao is one of the Board Representatives designated by THL, as discussed above in "Part Two—Board of Directors and Governance." Mr. Rao brings significant finance and business experience, including mergers and acquisitions experience, to the Board that he gained through his positions at THL and Morgan Stanley. Mr. Rao's viewpoints and ability to communicate and work with management have proven valuable to the Board.

51.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rao made the following sale of company stock, and made no purchases of Company stock.  On April 2, 2014, before the fraud was exposed, Defendant Rao sold 12,640,396 Company shares on inside information for $16.12 per share, for which he received over $203.8 million.[5] His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

**Defendant Turner**

52.     Defendant W. Bruce Turner ("Turner") has served as a Company director since 2010.  He also serves as a member of the Audit Committee and as a member of the Compliance and Ethics Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Turner beneficially owned 99,858 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Turner owned over $1.06 million worth of MoneyGram stock.

---

[5] Represents shares held by held by Thomas H. Lee Equity Fund VI, L.P., Thomas H. Lee Parallel Fund VI, L.P., Thomas H. Lee Equity Parallel (DT) Fund VI, L.P., THL Equity Fund VI Investors (MoneyGram), LLC, THL Coinvestment Partners, L.P., THL Operating Partners, L.P. and THL Managers VI, LLC, as well as Great-West Investors, L.P. and Putnam Investments Employees' Securities Company III, LLC.

53.     For the fiscal year ended December 31, 2017, Defendant Turner received $235,017 in compensation from the Company. This included $110,000 in fees earned or cash paid and $125,017 in stock awards.

54.     The Company's 2018 Proxy Statement stated the following about Defendant Turner:

**W. Bruce Turner,** 58, Director since 2010

Mr. Turner served as the Chief Executive Officer of Lottomatica S.p.A., a global lottery operations and technology services company, from 2006 to 2008. From 2002 to 2006, he served as Chief Executive Officer, as well as other executive roles, of GTECH Holdings Corporation, a global technology services company in the government regulated lottery industry, and now a subsidiary of Lottomatica. From 2001 to 2002, Mr. Turner served as Chairman of GTECH and from 2000 to 2001, he served as Chairman and Acting Chief Executive Officer. Prior to joining GTECH, Mr. Turner was the Managing Director, Gaming Equity Research, of Salomon Smith Barney Inc. from 1993 to 1999.

*Director Criteria:*   Mr. Turner brings significant leadership experience, financial acumen and regulatory experience to the Board that he gained through the numerous executive positions that he has held throughout the years, including serving as chairman of the board and chief executive officer of a public company. Mr. Turner also has substantial public company board and committee experience, through which he has handled a variety of governance, audit, regulatory and international issues. From this experience, Mr. Turner has been able to provide the Board with a diverse perspective and valuable insights.

**<u>Defendant Vaughan</u>**

55.     Defendant Peggy Vaughan ("Vaughan") has served as a Company director since 2014.  She also serves as a member of the Audit Committee.  According to the 2018 Proxy Statement, as of March 8, 2018, Defendant Vaughan beneficially owned 51,378 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 8, 2018 was $10.65, Vaughan owned over $547,175 worth of MoneyGram stock.

56.     For the fiscal year ended December 31, 2017, Defendant Vaughan received $225,017 in compensation from the Company. This included $100,000 in fees earned or cash paid and $125,017 in stock awards.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Vaughan:

> **Peggy Vaughan,** 64, Director since 2014
>
> Ms. Vaughan currently advises portfolio companies in technology, life sciences, consumer goods, financial services and media industries, and also serves on the advisory committee for TWV Capital Management, LLC. From 1979 to 2001, Ms. Vaughan held various consulting positions of increasing responsibility with PricewaterhouseCoopers ("PwC"), becoming a partner in 1988 and serving on the PwC U.S. Board of Partners and Global Oversight Board. Following the acquisition of PwC Consulting by IBM in 2002, Ms. Vaughan served as a member of the Global Management Board with responsibility for the integration of consulting practices and also served as the global leader of consulting services lines.
>
> *Director Criteria:* Ms. Vaughan's experience includes more than 25 years leading large-scale strategic, operational improvement, restructuring, technology and change management engagements. Her expertise includes information technology governance, digital technology, mergers and acquisitions and transaction integration, business strategy and operational management processes for industries such as energy, high technology, consumer products, financial services and telecommunications.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers, directors, and/or fiduciaries of MoneyGram and because of their ability to control the business and corporate affairs of MoneyGram, the Individual Defendants owed MoneyGram and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MoneyGram in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MoneyGram and its shareholders so as to benefit all shareholders equally.

59.     Each director and officer of the Company owes to MoneyGram and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

60.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MoneyGram, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

61.     To discharge their duties, the officers and directors of MoneyGram were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MoneyGram, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MoneyGram's Board at all relevant times.

63.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

64.     To discharge their duties, the officers and directors of MoneyGram were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MoneyGram were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Texas, Delaware, and the United States, and pursuant to MoneyGram's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MoneyGram conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MoneyGram and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MoneyGram's operations would comply with all applicable laws and MoneyGram's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

65.     Each of the Individual Defendants further owed to MoneyGram and the shareholders the duty of loyalty requiring that each favor MoneyGram's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

66.     At all times relevant hereto, the Individual Defendants were the agents of each other and of MoneyGram and were at all times acting within the course and scope of such agency.

67.     Because of their advisory, executive, managerial, and directorial positions with MoneyGram, each of the Individual Defendants had access to adverse, non-public information about the Company.

68.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MoneyGram.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

69.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

70.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of MoneyGram, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

73.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MoneyGram and was at all times acting within the course and scope of such agency.

## MONEYGRAM'S CODE OF CONDUCT

74.     The Company's Code of Conduct provides that it "applies to all MoneyGram employees."  MoneyGram's Corporate Governance Guidelines state that all directors "are expected to abide by [the Company's] Code of Conduct to insure that [its] business is conducted in a consistently legal and ethical manner."

75.     The Code of Conduct provides, as to "Compliance with Laws," that:

MoneyGram is committed to being a good corporate citizen. Because of this commitment, our employees must comply in all respects with any laws, rules and regulations that apply to our business, in each jurisdiction in which we do business. This includes, among other things, complying with anti-money laundering laws, anti-bribery and anti-corruption laws, privacy laws, and antitrust and competition laws.

76.     The Code of Conduct provides, as to "Fraud Prevention," that:

MoneyGram is vulnerable to many types of fraud and theft in our normal course of business, including attempts to defraud MoneyGram's consumers, agents, and the Company. You should take a proactive approach to prevent, detect and report fraud and theft at the workplace and by our consumers. Each employee is responsible for preventing fraud.

77.     The Code of Conduct provides, as to "Conflicts of Interest," that:

Our business is asking consumers to trust us to move their money. We must earn that trust, and therefore, we must avoid any relationship or activity that might impair, or even appear to impair, our ability to make objective and fair decisions when performing our jobs. A conflict of interest may arise when our interests interfere or appear to interfere with the Company's interests in any way. At times, we may be faced with situations where the business actions we take on behalf of MoneyGram may conflict with our own personal or family interests. We owe a duty to MoneyGram to advance its legitimate interests when the opportunity to do so arises. We must never use MoneyGram property or information for personal gain or personally take for ourselves any opportunity that is discovered through our position with MoneyGram.

78.    The Code of Conduct provides, as to "Compliance with Securities Laws," that:

MoneyGram is a public company. Our directors, officers and employees must comply with all laws and regulations applicable to our common stock and other publicly traded securities, including laws and regulations prohibiting trading on material nonpublic information, commonly called insider trading.

- In the course of your work, you may use or have access to material nonpublic information concerning MoneyGram, or those with whom it does business, such as customers, suppliers or potential acquisition targets. Material nonpublic information is any information which an investor is likely to consider important in determining whether to buy, sell or hold securities.

- You may not purchase or sell common stock or other securities of MoneyGram while you are in possession of material, nonpublic information relating to MoneyGram, nor, in the absence of any legitimate business reason, disclose such material, nonpublic information to anyone (except employees or agents who have a legitimate need to know the information), unless such disclosure is approved in advance by our Legal Department as part of our pre-clearance authorization process. This includes common stock or other securities of MoneyGram you hold outright, in a brokerage account, in the 401(k) plan or in any other MoneyGram benefit plan that includes MoneyGram stock (other than pre-established contributions to such plans, such as automatic payroll investments).

- You must avoid talking about any aspect of our business that is not already public knowledge.

- Our trading and disclosure restrictions also apply to information obtained in the course of your employment relating to any other company, including our customers, suppliers and potential acquisition targets.

- Our insider trading policy includes additional rules that apply when our directors and officers trade in MoneyGram securities.

- Failure to adhere to our insider trading policy may lead to the termination of your employment and possible criminal prosecution.

- Please refer to our Insider Trading Policy for more information.

79.     The Code of Conduct provides, as to "Books and Records," that:

All transactions must be properly approved and accurately reflected on our books and records. Falsification of transactions or records, off-the-record trading or cash accounts, or other off-the record business transactions are strictly prohibited and subject to disciplinary action, including dismissal.

80.     The Code of Conduct provides, as to "Public Reports and Disclosures," that:

We are committed to providing full, fair, accurate, timely and understandable disclosure of relevant information to stockholders, investors and the Securities and Exchange Commission.

- Reporting financial information to shareholders, investors and the Commission requires the highest standards of fairness and honesty. The harm done to our reputation and investors by fraudulent or misleading reporting can be severe.

- Dishonest financial reporting can also result in civil or criminal penalties to the individuals involved and to the Company. Consequently, reporting any false or misleading information in internal or external financial reports is strictly prohibited.

81.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. Two of the Individual Defendants violated the Code of Conduct by selling shares of Company stock while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82.     The Company provides consumers with money transfer services worldwide through a network of hundreds of thousands of agent locations in over 200 countries and territories. The Company's customers can transfer funds through MoneyGram's money transfer system in person, online, via mobile device, or at a self-service kiosk at a Company agent location.

83.     The Company's money transfer system is susceptible to fraud because funds sent through the Company's system can quickly be obtained at many agent locations worldwide, and consumers are usually not able to get their money back once it has been paid out.  Fraudsters also have enjoyed the benefit of anonymity when obtaining funds through the Company by, in some cases, not even being prompted for identification or by using fake information when picking up transfers.

84.     The Order bans the Company from, *inter alia*, failing to: (1) establish, implement and maintain a comprehensive anti-fraud program reasonably designed to protect consumers in the U.S. and Canada; (2) conduct thorough due diligence on potential agents and make certain that its agreements require agents to have in place effective anti-fraud procedures and policies; (3) adequately monitor MoneyGram's agents; and (4) provide the FTC with consumer complaint information.

### The Fraudulent Misconduct

*MoneyGram Facilitates Fraudsters' Use of Its Money Transfer System*

85.     Since at least 2003, the Individual Defendants caused the Company to provide a money transfer system to consumers that has regularly been used to facilitate fraud.  Through MoneyGram's system, such fraudsters obtain money from the Company's customers fraudulently.

86.     Many of these scams involve fraudulent telemarketing in violation of the FTC's Telemarketing Rule.  Such telemarketing scams involve consumers being instructed over the phone to send money transfers through the Company's money transfer system.  The fraudulent telemarketers use false and misleading statements to get consumers to pay for purported services or goods.  Examples include, lottery scams, prize scams, mystery shopping scams, and advance-fee loan scams.  The consumers who fall victim to these scams, however, receive nothing in return for their transfer of money.

87.     The fraudsters get consumers to transfer money via one of MoneyGram's agents, and frequently collect the funds from a corrupt MoneyGram agent location.  The Company has received fraud related complaints from its agent locations worldwide, and patterns clearly indicate that certain of the agent locations are engaging in at least suspicious, if not outright fraudulent, behavior.  For example, 131 Canadian agents for which the Company had received five or more fraud complaints for in 2008 accounted for 79.4% of all the Company's money transfers of at least $1000 that were sent to Canada from the U.S.  Some of the complaints noted that the Company's agents recorded thousands of drivers license numbers were fabricated in connection with money transfers.  Other complaints note that certain agent locations would allow the same individuals to return multiple times a day to collect fraud-induced money transfers using false identification.

88.     The Company's records show that from January 2004 through December 2008, MoneyGram received approximately 20,688 complaints from its U.S. consumers who reported that they were scammed out of at least an aggregate sum of $44.1 million through fraud-induced money transfers to Canada.  MoneyGram also received 20,415 more complaints from U.S. consumers reporting that they lost in the aggregate at least $40.5 million from fraud-induced money transfers in the U.S.  The Company's money transfer services facilitated such losses.

89.     Third parties further put the Company on notice of fraudsters using the Company's money transfer service.  For instance, law enforcement conferences in Canada in January 2003 and March 2004 included discussion from law enforcement officials concerning the widespread use of MoneyGram's system for fraud and the Company's failure to address the issue.  One of MoneyGram's fraud investigative analysts was present at these conferences and informed the manager of MoneyGram's Fraud and Compliance Departments of the law enforcement officials' statements.  The Individual Defendants were thus aware of the alarming use of its money transfer system to effectuate fraud on consumers.

90.     In breach of their fiduciary duties, the Individual Defendants have allowed the Company's money transfer system to be abused by fraudsters and have failed to implement necessary and required anti-fraud measures to effectively combat fraudulent activity.  The Order sought to address fraudulent money transfer activity running rampant through the Company's agents, and the lack of proper oversight over such activity taken by the Company.  The Individual Defendants, however, further breached their fiduciary duties by failing to cause the Company to adhere to the requirements of the Order, and thus allow the Fraudulent Misconduct to continue to occur.

91.     In violation of the Order, the Company failed to take the necessary measures to prevent and detect consumer fraud over its money transfer system, allowing it to continue to be utilized worldwide by fraudsters to fraudulently obtain money from victims.  In some instances, the Company failed to adequately train its agents, promptly investigate suspect agents, take required action against problematic agents, and perform required background checks on agents to avoid their involvement in fraud.  In other instances, the Company failed to adopt and implement anti-fraud procedures and policies consistent with the Order.  MoneyGram moreover failed to

record and provide to the FTC all consumer complaints it received concerning fraud-induced money transfers.   Additionally, the Company failed to properly implement and operate an interdiction system which, from about April 2015 through October 2016, failed to prevent the fraud-induced transfer of millions of dollars.

*Failure to Promptly Investigate and Discipline Agents*

92.      Several of the Company's agent locations showed high levels of consumer fraud, and MoneyGram in multiple instances failed to promptly investigate and take required disciplinary action against these agent locations.

93.      Per the Order, the Company is required to conduct timely consumer fraud investigations of any agent locations that either: (1) has received two or more fraud complaints in a 30 day period; (2) has shown unusual or suspicious money transfer activity that cannot be reasonably justified or explained; or had fraud complaints totaling to five percent or more of the agent location's total received transactions calculated on a monthly basis.  Depending on which of these events triggers an investigation, the Company is required to complete an investigation within 14 or 30 days.  If MoneyGram does not complete the investigation in the required time, it must suspend the agent location until the completion of the investigation.  In violation of the Order, the Company did not conduct the required reviews or suspend agents when investigations were not timely completed.

94.      MoneyGram particularly failed to discipline certain individual locations of large chain agents, which the Company treated differently than lower volume agents.  Pursuant to the Order, the Company is required to suspend, restrict, or terminate locations that have failed to take the steps required to prevent fraud-induced money transfers.  Several of the Company's agent locations, however, in many instances failed to record required information, monitor money

transfer activity, train and oversee employees, and refuse transfers that were likely fraud-induced. Some agent locations were even complicit in fraudulent activity, yet the Company did promptly terminate them as required by the Order.

95.     The Company's own internal records show that it was aware of high levels of fraud and suspicious activities involving some of its agents for years.  The Company, however, on multiple occasions failed to take the required disciplinary action against such agents per the Order. The Company's records include, *inter alia*, high levels and patterns of complaints, transfers exceeding average amounts, issues in data integrity, payouts minutes after transfers, and substantial transfers into countries with high.  Although the Order required the termination of agent locations that "may be complicit" in fraud-induced money transfers, the Company developed different standards for disciplinary actions concerning large chain agents.

*Failure to Properly Money Transfer Activity and Maintain Safeguards*

96.     Pursuant to the Order, the Company is required to implement a comprehensive anti-fraud program.  The program must include adequate and appropriate monitoring of the activity of agents concerning the prevention of fraud-induced money transfers.  The Company, in violation of the Order, failed to adequately monitor and prevent fraud-induced money transfers, including transfers involving recipients that were the subject of consumer fraud complaints or had engaged in suspicious activity.  In some instances, such recipients were part of fraud rings which conducted multiple suspicious transfers and agent locations within a geographic area.

97.     Despite the Company's anti-fraud program being required to have "administrative, technical, and physical safeguards appropriate to [the Company's] size and complexity, and the nature and scope of [the Company's] activities, the Company failed to maintain technical safeguards from at least the period from April 2015 through October 2016.  The Company's

interdiction system during this period, intended to block fraud-induced money transfers, dealt with serious technical issues and was not effective at blocking a substantial number of fraud-induced money transfers.  As one consequence of these technical issues, the Company failed to add individuals who received or were linked to fraud-induced money transfers to its Internal Watch List, used by the Company's system in blocking fraud-induced money transfers.

*Failure to Properly Train Agents*

98.     Also per the Order, the Company is required to provide all its agents with adequate and appropriate ongoing training and education concerning the detection and prevention of consumer fraud.  In violation of the Order, the Company failed at times to provide the requisite training, and failed to have some of its agents properly train their own employees.  The Company also gave only limited training to certain agents.

99.     The Company, in many instances, utilized a "train the trainer" method, relying on its agents to provide training to their employees handling money transfer processing.  The Company did not ensure that agents' employees that handled money transfers were trained adequately about consumer fraud.  A 2014 audit of 397 locations of a large chain agent revealed that 1,863 employees responsible for money transfer processing had did not have either initial or ongoing training, and many employees did not have any training.  Even after the Company began a new audit procedure in 2015, involving providing advance notice of store audits and warnings about the consequences of non-compliance, audits continued to discover some chain locations failing to train employees.

100.    The Company moreover failed to make high-fraud agent locations promptly train their employees in consumer fraud prevention despite such agent locations being required to as a remedial measure.

*Failure to Adequately Conduct Due Diligence of Agents*

101.    The Order required the Company to conduct "thorough due diligence" on prospective Company agents to prevent the installation of agents that might become involved in or complicit in fraudulent activity.  The Company however failed to conduct such due diligence in some instances.

102.    The Order specifically requires the Company to conduct due diligence that requires verification of identification, background checks, inquiries into previous fraudulent behavior, and individualized assessment of applications.  The Company, however, installed agents that had been closed down by other money services business for fraud related reasons or had backgrounds showing that they were at risk of engaging in processing fraud-induced money transfers.  The Company further failed to maintain records representing that the required due diligence had been conducted.

*Failure to Record All Consumer Complaints*

103.    The Company is required by the Order to record all complaints it receives concerning fraud-induced money transfers and to share information about the complaints with the FTC.

104.    MoneyGram, however, failed to meet this requirement in some instances and failed to record and provide to the FTC information received related to fraud-induced money transfers. The Company, also in violation of the Order, failed to share with the FTC's complaint recording system all complaints received and recorded by the Company in its complaint database concerning U.S. and Canadian consumers.

Verified Shareholder Derivative Complaint

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements During the Securities Fraud Relevant Period

#### *February 11, 2014 Press Release*

105.    On February 11, 2014, the Company issued a press release announcing its financial results for its fourth fiscal quarter and year ended December 13, 2013.  In the press release, the Company commented on its efforts to enhance legal and regulatory compliance, stating, in relevant part:

> MoneyGram today separately announced several changes to better support the Company's corporate objectives, including its goal of reaching $2 billion in annual revenue in 2017. These actions include realigning the organizational structure and commencing a global transformation program designed to help MoneyGram lead the industry in compliance, fuel multi-channel growth and improve its cost structure. These initiatives are:
>
> - **Enhancing compliance.** The legal and regulatory requirements for the financial services industry continue to increase. Since 2009, MoneyGram has invested more than $120 million in its compliance and anti-fraud programs and has successfully prevented more than $365 million in fraud losses, with $135 million prevented in 2013. The Company will continue to advance its leadership in global compliance by implementing market-leading systems, technology and processes, and increasing agent oversight around the world. This program now incorporates an accelerated timeline and certain additional enhancements which were recommended by the monitor. At this time, the Company expects to incur cash outlays of approximately $80 to $90 million over the next three years.

#### *March 3, 2014 Form 10-K*

106.    On March 3, 2014, the Company filed an annual report on Form 10-K for its fourth fiscal quarter and year (the "2013 10-K"), which was signed by Defendants Patsley and Holmes, and signed by Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan through attorney-in-fact F. Aaron Henry.

107.    The 2013 10-K commented on the Company's compliance with legal and regulatory changes, stating, in relevant part:

**Regulation**

Compliance with laws and regulations is a highly complex and integral part of our day-to-day operations. Our operations are subject to a wide range of laws and regulations of the U.S. and other countries, including anti-money laundering laws and regulations; financial services regulations; currency control regulations; anti-bribery laws; regulations of the U.S. Treasury Department's Office of Foreign Assets Control, or OFAC; money transfer and payment instrument licensing laws; escheatment laws; privacy, data protection and information security laws; and consumer disclosure and consumer protection laws. Failure to comply with any applicable laws and regulations could result in restrictions on our ability to provide our products and services, as well as the potential imposition of civil fines and possibly criminal penalties. See "*Risk Factors*" for additional discussion regarding potential impacts of failure to comply. ***We continually monitor and enhance our global compliance programs to comply with the most recent legal and regulatory changes.*** Since 2009 we have invested over $120.0 million in our compliance and anti-fraud programs and prevented more than $365.0 million in fraud losses during the same time period.

(Emphasis added.)

108.    Attached to the 2013 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Patsley and Holmes attesting to the accuracy of the 2013 10-K.

**April 1, 2014 Proxy Statement**

109.    On April 1, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement"). Defendants Patsley, Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

110.    The 2014 Proxy Statement stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ."

111.    The 2014 Proxy Statement was false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

112.    The Individual Defendants also caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

113.    The 2014 Proxy Statement moreover failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

### March 3, 2015 Form 10-K

114.    On March 3, 2015, the Company filed an annual report on Form 10-K for its fourth fiscal quarter and year ended December 31, 2014 (the "2014 10-K"), which was signed by Defendants Patsley and Holmes, and signed by Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan through attorney-in-fact F. Aaron Henry.

115.    The 2014 10-K commented on the Company's compliance with legal and regulatory changes, stating, in relevant part:

**Regulation**

Compliance with laws and regulations is a highly complex and integral part of our day-to-day operations. Our operations are subject to a wide range of laws and regulations of the U.S. and other countries, including anti-money laundering laws and regulations; financial services regulations; currency control regulations; anti-bribery laws; regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); money transfer and payment instrument licensing laws; escheatment laws; privacy, data protection and information security laws; and consumer disclosure and consumer protection laws. Regulators worldwide are exercising heightened supervision of money transfer providers and requiring increased efforts to ensure compliance. Failure to comply with any applicable laws and regulations could result in restrictions on our ability to provide our products and services, as well as the potential imposition of civil fines and possibly criminal penalties. See *"Risk Factors"* section in Item 1A of this Annual Report on Form 10-K for additional discussion regarding potential impacts of failure to comply. ***We continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes.*** We also launched the compliance enhancement program in 2014 to enhance our systems and processes.

(Emphasis added.)

116.   Attached to the 2014 10-K were SOX certifications signed by Defendants Patsley and Holmes attesting to the accuracy of the 2014 10-K.

*April 2, 2015 Proxy Statement*

117.   On April 2, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement"). Defendants Patsley, Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan solicited the 2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[7]

---

[7] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

118.    The 2015 Proxy Statement stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ."

119.    The 2015 Proxy Statement was false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

120.    The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

121.    The 2015 Proxy Statement moreover failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

### *March 2, 2016 Form 10-K*

122.    On March 2, 2016, the Company filed an annual report on Form 10-K for its fourth fiscal quarter and year ended December 31, 2015 (the "2015 10-K"), which was signed by Defendants Patsley, Holmes, and Angelilli, and signed by Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan through attorney-in-fact F. Aaron Henry.

123.    The 2015 10-K commented on the Company's compliance with legal and regulatory changes, stating, in relevant part:

**Regulation**

Compliance with laws and regulations is a highly complex and integral part of our day-to-day operations. Our operations are subject to a wide range of laws and regulations of the U.S. and other countries, including anti-money laundering laws and regulations; financial services regulations; currency control regulations; anti-bribery laws; regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); money transfer and payment instrument licensing laws; escheatment laws; privacy, data protection and information security laws; and consumer disclosure and consumer protection laws. Regulators worldwide are exercising heightened supervision of money transfer providers and requiring increased efforts to ensure compliance. Failure to comply with any applicable laws and regulations could result in restrictions on our ability to provide our products and services, as well as the potential imposition of civil fines and possibly criminal penalties. See "*Risk Factors*" section in Item 1A for additional discussion regarding potential impacts of failure to comply. ***We continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes.*** We also launched the compliance enhancement program in 2014 to enhance our systems and processes.

(Emphasis added.)

124.    Attached to the 2015 10-K were SOX certifications signed by Defendants Holmes and Angelilli attesting to the accuracy of the 2015 10-K.

### April 4, 2016 Proxy Statement

125.    On April 4, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement"). Defendants Patsley, Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[8]

---

[8] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

126.    The 2016 Proxy Statement stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ."

127.    The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

128.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

129.    The 2016 Proxy Statement moreover failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

### March 16, 2017 Form 10-K

130.    On March 16, 2017, the Company filed an annual report on Form 10-K for its fourth fiscal quarter and year ended December 31, 2016 (the "2016 10-K"), which was signed by Defendants Holmes and Angelilli, and signed by Defendants Patsley, Clark, Dahir, Garza, Lawry, Rao, Turner, Rafferty, and Vaughan through attorney-in-fact F. Aaron Henry.

131.    The 2016 10-K commented on the Company's compliance with legal and regulatory changes, stating, in relevant part:

**Regulation**

Compliance with laws and regulations is a highly complex and integral part of our day-to-day operations. Our operations are subject to a wide range of laws and regulations of the U.S. and other countries, including anti-money laundering laws and regulations; financial services regulations; currency control regulations; anti-bribery laws; regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); money transfer and payment instrument licensing laws; escheatment laws; privacy, data protection and information security laws; and consumer disclosure and consumer protection laws. Regulators worldwide are exercising heightened supervision of money transfer providers and requiring increased efforts to ensure compliance. Failure to comply with any applicable laws and regulations could result in restrictions on our ability to provide our products and services, as well as the potential imposition of civil fines and possibly criminal penalties. See "*Risk Factors*" section in Item 1A for additional discussion regarding potential impacts of failure to comply. ***We continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes.*** We also launched the compliance enhancement program in 2014 to enhance our systems and processes.

(Emphasis added.)

132.    Attached to the 2016 10-K were SOX certifications signed by Defendants Holmes and Angelilli attesting to the accuracy of the 2016 10-K.

*April 27, 2017 Proxy Statement*

133.    On April 27, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Patsley, Clark, Dahir, Garza, Lawry, Rao, Turner, Rafferty, and Vaughan solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

134.    The 2017 Proxy Statement stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ."

135.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

136.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

137.    The 2017 Proxy Statement moreover failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

### March 16, 2018 Form 10-K

138.    On March 16, 2018, the Company filed an annual report on Form 10-K for its fourth fiscal quarter and year ended December 31, 2017 (the "2017 10-K"), which was signed by Defendants Holmes and Angelilli, and signed by Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, Rafferty, and Vaughan through attorney-in-fact F. Aaron Henry.

139.    The 2017 10-K commented on the Company's compliance with legal and regulatory changes, stating, in relevant part:

**Regulation**

Compliance with laws and regulations is a highly complex and integral part of our day-to-day operations. Our operations are subject to a wide range of laws and regulations of the U.S. and other countries, including anti-money laundering laws and regulations; financial services regulations; currency control regulations; anti-bribery laws; regulations of the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"); money transfer and payment instrument licensing laws; escheatment laws; privacy, data protection and information security laws; and consumer disclosure and consumer protection laws. Regulators worldwide are exercising heightened supervision of money transfer providers and requiring increased efforts to ensure compliance. Failure to comply with any applicable laws and regulations could result in restrictions on our ability to provide our products and services, as well as the potential imposition of civil fines and possibly criminal penalties. See "*Risk Factors*" section in Item 1A for additional discussion regarding potential impacts of failure to comply. ***We continually monitor and enhance our global compliance programs in light of the most recent legal and regulatory changes.***

(Emphasis added.)

140.    Attached to the 2017 10-K were SOX certifications signed by Defendants Holmes and Angelilli attesting to the accuracy of the 2017 10-K.

### *April 2, 2018 Proxy Statement*

141.    On April 2, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, Rafferty, and Vaughan solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[10]

---

[10] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

142. The 2018 Proxy Statement stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ."

143. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

144. The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

145. The 2018 Proxy Statement moreover failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

146. The statements in ¶¶ 105-108, 114-116, 122-124, 130-132, and 138-140 were materially false and misleading, and they failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants failed and/or caused the Company to fail to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

### The Truth Emerges

### *November 8, 2018 FTC Press Release*

147.    On November 8, 2018, the FTC issued a press release announcing that the Company agreed to pay $125 million to settle allegations that MoneyGram violated the Order with the FTC and breached the DPA.  The press release disclosed that the FTC filed a complaint against the Company that alleged, *inter alia*, that the Company "was aware for years of the high levels of fraud and suspicious activities involving certain agents"; "failed to implement the comprehensive fraud prevention program mandated by the 2009 [Order]"; permitted its computerized monitoring system to malfunction; failed to share with the FTC complaints related to fraud-induced money transfers; and failed to adequately screen its agents and provide proper training on detecting and preventing consumer fraud.

148.    The press release commented on the terms of the settlement and the Company's violations of the Order, stating, in relevant part:

> MoneyGram International, Inc. has agreed to pay $125 million to settle allegations that the company failed to take steps required under a 2009 Federal Trade Commission order to crack down on fraudulent money transfers that cost U.S. consumers millions of dollars.

> The $125 million payment is part of a global settlement that resolves allegations that MoneyGram also violated a separate 2012 deferred prosecution agreement with the Department of Justice.

> "The FTC's 2009 order required MoneyGram to protect consumers from fraud through its money transfer system, and today we are holding MoneyGram accountable for its failure to do so," said FTC Chairman Joe Simons. "MoneyGram's alleged failure to implement key provisions of the order allowed scammers to continue to use its money transfer system to rip off consumers."

> Money transfers are a preferred method of payment for fraudsters because money sent through money transfer systems can be picked up quickly at locations all over the world, and once the money is paid out, it is all but impossible for consumers to get their money back. The systems also often allow scam artists to remain anonymous when receiving money from their victims.

In its new filing addressing violations of the 2009 order, the FTC alleges that MoneyGram failed to implement the comprehensive fraud prevention program mandated by the 2009 order, which requires the company to promptly investigate, restrict, suspend, and terminate high-fraud agents.

The 2009 order required MoneyGram to conduct timely fraud investigations of any agent location that has received two or more fraud complaints within 30 days; has fraud complaints totaling 5 percent or more of the location's total monthly received transactions; or has displayed any unusual or suspicious money transfer activity. It also must terminate locations that may be complicit in fraud-induced money transfers.

149.    The press release detailed the FTC's allegations, stating, in relevant part:

The FTC alleges that MoneyGram was aware for years of the high levels of fraud and suspicious activities involving certain agents, including large chain agents. For example, the standards MoneyGram established for taking disciplinary actions did not comply with the 2009 order, because those standards required agents to have unreasonably high fraud rates before they could be suspended or terminated, according to the FTC. At the same time, MoneyGram also often failed to promptly conduct the required reviews or to suspend or terminate agents, particularly those from larger locations with high levels of fraud.

The FTC alleges, for example, that MoneyGram did not place any restrictions on one large chain agent until approximately mid-2013, even though the chain was the subject of more fraud complaints than any other MoneyGram agent worldwide. Some of the chain's locations had fraud rates as high as 50 percent of the money transfer activity. When it did take disciplinary action, MoneyGram focused on lower-volume, "mom and pop" agents with high levels of fraud, while treating large chain agents differently, according to the FTC.

The FTC also alleges that MoneyGram's computerized monitoring system, aimed at blocking known fraudsters from using its service, malfunctioned for an 18-month period in 2015 and 2016. During that time, MoneyGram failed to block individuals that the company knew or should have known were using its service for fraud or to obtain fraud-induced money transfers.

MoneyGram also allegedly violated the order by failing to properly vet its agents and by not providing appropriate training on how to detect and prevent consumer fraud for all its agents, including locations with high fraud rates.

Under the 2009 order, MoneyGram also was required to record the complaints it receives about fraud-induced money transfers and to share that information with the Commission. Between January 1, 2013 and April 30, 2018, MoneyGram received at least 295,775 complaints about fraud-induced money transfers—a large

majority of which involved a small percentage of agents. The Commission alleges, however, that the company, in some cases, failed to record information it received about fraud-induced money transfers and share it with the FTC.

150.     The press release moreover commented on an agreed-to modified order superseding

the Order, stating, in relevant part:

> In addition to the monetary payment, MoneyGram has agreed to an expanded and modified order that will supersede the 2009 order and apply to money transfers worldwide. The modified order requires, among other things, that the company block the money transfers of known fraudsters and provide refunds to fraud victims in circumstances where its agents fail to comply with applicable policies and procedures. In addition, the modified order includes enhanced due diligence, investigative, and disciplinary requirements.

### *November 8, 2018 Press Release*

151.     On November 8, 2018, the Company issued a press release announcing its financial

results for its third fiscal quarter ended September 30, 2018.  The press release reported a decline

in money transfer revenue compared to the same period in the prior year, and noted the impact of

higher compliance standards, stating, in relevant part: "Money transfer revenue was $304.2

million, representing a decrease of 15% on a reported basis and a decrease of 14% on a constant

currency basis as compared to third quarter 2017. Revenue results include the impact of higher

compliance standards and newly implemented corridor specific controls."

152.     On this news, the price per share of MoneyGram common stock fell $2.20, or

approximately 49.2%, from the previous day's closing price, closing at $2.27 per share on

November 9, 2018.

### <u>Repurchases During the Securities Fraud Relevant Period</u>

153.     During the period in which the Company made false and misleading statements and

omissions, the Individual Defendants caused the Company to initiate repurchases of its common

stock at artificially inflated prices that substantially damaged the Company. In total, the Company

spent an aggregate amount of over $28.7 million to repurchase 3,128,336 shares of its own common stock at artificially inflated prices from July 2014 through December 2016, inclusive.

154.    As the Company stock was actually only worth $2.27 per share, the price at closing on November 9, 2018, the Company overpaid approximately $21.6 million in total for these repurchases.

155.    According to the Company's Form 10-Q filed with the SEC on November 13, 2014, in the month of August 2014, the Individual Defendants caused the Company to repurchase 410,000 shares of its own common stock at an average price per share of $14.11, for a total cost to the Company of approximately $5.79 million

156.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $11.84 more than the actual worth of each share during the month of August 2014. Thus, the total over payment by the Company for repurchases of its own stock during the month of August 2014 was approximately $4.85 million.

157.    According to the Company's Form 10-Q filed with the SEC on November 13, 2014, in the month of September 2014, the Individual Defendants caused the Company to repurchase 232,700 shares of its own common stock at an average price per share of $14.13, for a total cost to the Company of approximately $3.29 million.

158.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $11.86 more than the actual worth of each share during the month of September 2014. Thus, the total over payment by the Company for repurchases of its own stock during the month of September 2014 was approximately $2.76 million.

Verified Shareholder Derivative Complaint

159.     According to the Company's Form 10-K filed with the SEC on March 3, 2015, in the month of November 2014, the Individual Defendants caused the Company to repurchase 209,200 shares of its own common stock at an average price per share of $8.70, for a total cost to the Company of approximately $1.82 million.

160.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.43 more than the actual worth of each share during the month of November 2014. Thus, the total over payment by the Company for repurchases of its own stock during the month of November 2014 was approximately $1.35 million.

161.     According to the Company's Form 10-K filed with the SEC on March 3, 2015, in the month of December 2014, the Individual Defendants caused the Company to repurchase 662,500 shares of its own common stock at an average price per share of $8.62, for a total cost to the Company of approximately $5.71 million.

162.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.35 more than the actual worth of each share during the month of December 2014. Thus, the total over payment by the Company for repurchases of its own stock during the month of December 2014 was approximately $4.21 million.

163.     According to the Company's Form 10-Q filed with the SEC on November 2, 2015, in the month of August 2015, the Individual Defendants caused the Company to repurchase 48,500 shares of its own common stock at an average price per share of $8.50, for a total cost to the Company of $412,250.

Verified Shareholder Derivative Complaint

164.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $6.23 more than the actual worth of each share during the month of August 2015. Thus, the total over payment by the Company for repurchases of its own stock during the month of August 2015 was $302,155.

165.    According to the Company's Form 10-Q filed with the SEC on May 3, 2016, in the month of March 2016, the Individual Defendants caused the Company to repurchase 324,529 shares of its own common stock at an average price per share of $6.01, for a total cost to the Company of approximately $1.95 million.

166.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $3.74 more than the actual worth of each share during the month of March 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of March 2016 was approximately $1.21 million.

167.    According to the Company's Form 10-Q filed with the SEC on August 1, 2016, in the month of May 2016, the Individual Defendants caused the Company to repurchase 395,065 shares of its own common stock at an average price per share of $6.09, for a total cost to the Company of approximately $2.41 million.

168.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $3.82 more than the actual worth of each share during the month of May 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of May 2016 was approximately $1.51 million.

Verified Shareholder Derivative Complaint

169.    According to the Company's Form 10-Q filed with the SEC on August 1, 2016, in the month of June 2016, the Individual Defendants caused the Company to repurchase 32,482 shares of its own common stock at an average price per share of $6.62, for a total cost to the Company of approximately $215,031.

170.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.35 more than the actual worth of each share during the month of June 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of June 2016 was approximately $141,297.

171.    According to the Company's Form 10-Q filed with the SEC on October 31, 2016, in the month of August 2016, the Individual Defendants caused the Company to repurchase 287,532 shares of its own common stock at an average price per share of $7.07, for a total cost to the Company of approximately $2.03 million.

172.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.80 more than the actual worth of each share during the month of August 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of August 2016 was approximately $1.38 million.

173.    According to the Company's Form 10-Q filed with the SEC on October 31, 2016, in the month of September 2016, the Individual Defendants caused the Company to repurchase 131,287 shares of its own common stock at an average price per share of $7.05, for a total cost to the Company of approximately $925,573.

Verified Shareholder Derivative Complaint

174.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.78 more than the actual worth of each share during the month of September 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of September 2016 was approximately $627,552.

175.    According to the Company's Form 10-K filed with the SEC on March 16, 2017, in the month of November 2016, the Individual Defendants caused the Company to repurchase 198,541 shares of its own common stock at an average price per share of $9.71, for a total cost to the Company of approximately $1.93 million.

176.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $7.44 more than the actual worth of each share during the month of November 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of November 2016 was approximately $1.48 million.

177.    According to the Company's Form 10-K filed with the SEC on March 16, 2017, in the month of December 2016, the Individual Defendants caused the Company to repurchase 196,000 shares of its own common stock at an average price per share of $11.46, for a total cost to the Company of approximately $2.25 million.

178.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $9.19 more than the actual worth of each share during the month of December 2016. Thus, the total over payment by the Company for repurchases of its own stock during the month of December 2016 was approximately $1.8 million.

Verified Shareholder Derivative Complaint

179.    In total, the Company overpaid an aggregate amount of approximately $21.6 million for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

## DAMAGES TO MONEYGRAM

180.    As a direct and proximate result of the Individual Defendants' conduct, MoneyGram has lost and expended, and will lose and expend, many millions of dollars.

181.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its former CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

182.    Such expenditures include, but are not limited to, amounts paid to settle allegations brought by government agencies arising from the Fraudulent Misconduct, including the $125 million the Company most recently agreed to pay to the FTC.

183.    Such expenditures include, but are not limited to, legal fees associated with the NYDFS' investigation of the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

184.    Such losses include, but are not limited to, approximately $21.6 million that the Company overpaid, at the direction of the Individual Defendants, for the Company's repurchases of its own stock at artificially inflated prices.

185.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

186.    As a direct and proximate result of the Individual Defendants' conduct, MoneyGram has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

187.    Plaintiff brings this action derivatively and for the benefit of MoneyGram to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MoneyGram, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

188.    MoneyGram is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189.    Plaintiff is, and has been continuously at all relevant times, a shareholder of MoneyGram. Plaintiff will adequately and fairly represent the interests of MoneyGram in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

190.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

191.    A pre-suit demand on the Board of MoneyGram is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine Individual Defendants: Defendants Holmes, Clark, Dahir, Garza, Lawry, Rafferty, Rao, Turner, and Vaughan (the

"Directors").  Plaintiff needs only to allege demand futility as to five of the nine Directors who were on the Board at the time this action was commenced.

192.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to overpay for repurchases of its own stock and one of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

193.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

194.    Additional reasons that demand on Defendant Holmes is futile follow. Defendant Holmes has served as the Company's CEO since January 2016 and as Chairman of the Board since February 2018.  He previously served as the Company's Executive Vice President, CFO and Chief Operating Officer beginning in February 2014.   Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Holmes with his principal occupation, and he receives handsome compensation, including $4,275,806 in fiscal 2017. Defendant Holmes was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2013-2017 10-Ks, which he signed and signed SOX

certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Holmes is a defendant in the Securities Class Action. For these reasons, too, Defendant Holmes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

195. Additional reasons that demand on Defendant Lawry is futile follow. Defendant Lawry has served as a Company director since 2008 and serves as a member of the Compliance and Ethics Committee and as a member of the Human Resources and Nominating Committee. Defendant Lawry is also an Advisory Partner and Managing Director of THL, which owns 42.8% of the Company's common stock as of March 8, 2018 and appointed him to the Board. Thus, as the Company admits, he is a non-independent director. His insider sale before the fraud was exposed, which yielded over $203.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. As a long-time and trusted Company director he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Lawry signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Lawry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Rao is futile follow. Defendant Rao has served as a Company director since 2008 and serves as a member of the Compliance and Ethics Committee.  Defendant Rao is also an Advisory Partner and Managing Director of THL, which owns 42.8% of the Company's common stock as of March 8, 2018 and appointed him to the Board. Thus, as the Company admits, he is a non-independent director.  His insider sale before the fraud was exposed, which yielded over $203.8 million in proceeds, demonstrates his motive in facilitating and participating in the fraud.  As a long-time and trusted Company director he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Rao signed, and thus personally made the false and misleading statements in, the 2016 10-K. For these reasons, too, Defendant Rao breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since November 2015 and serves as Chair of the Human Resources and Nominating Committee.  Defendant Clark receives handsome compensation, including $245,017 in fiscal 2017. As a trusted Company director he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Clark signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Clark breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Dahir is futile follow. Defendant Dahir has served as a Company director since 2010 and serves as Chair of the Audit Committee. Defendant Dahir receives handsome compensation, including $245,017 in fiscal 2017. As a trusted, long-time Company director and Chair of the Audit Committee he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dahir signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Dahir breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Garza is futile follow. Defendant Garza has served as a Company director since 2012 and serves as Chair of the Compliance and Ethics Committee and as a member of the Human Resources and Nominating Committee. Defendant Garza receives handsome compensation, including $245,017 in fiscal 2017. As a trusted and long-time Company director he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Garza signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Garza breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Rafferty is futile follow. Defendant Rafferty has served as a Company director since March 2016 and serves as a member of the Audit Committee.  Defendant Rafferty receives handsome compensation, including $225,017 in fiscal 2017. As a trusted Company director and member of the Audit Committee he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Rafferty signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Rafferty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

201.    Additional reasons that demand on Defendant Turner is futile follow. Defendant Turner has served as a Company director since 2010 and serves as a member of the Audit Committee and as a member of the Compliance and Ethics Committee.  Defendant Turner receives handsome compensation, including $235,017 in fiscal 2017. As a trusted, long-time Company director and member of the Audit Committee he conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Turner signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Turner breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.     Additional reasons that demand on Defendant Vaughan is futile follow. Defendant Vaughan has served as a Company director since 2014 and serves as a member of the Audit Committee.  Defendant Vaughan receives handsome compensation, including $225,017 in fiscal 2017. As a trusted, long-time Company director and member of the Audit Committee she conducted little, if any, oversight of the Company's engagement in the Fraudulent Misconduct and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Vaughan signed, and thus personally made the false and misleading statements in, the 2013-2017 10-Ks. For these reasons, too, Defendant Vaughan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

203.     Additional reasons that demand on the Board is futile follow.

204.     Defendants Holmes, Clark, Dahir, Garza, Rafferty, Turner, and Vaughan, are controlled by and beholden to Defendants Lawry and Rao, who as Advisory Partners and Managing Directors of THL, effectively control the Company.  THL appointed Defendants Lawry and Rao to the Board and, as of March 8, 2018, owns 42.8% of the Company's common stock. Thus, demand is futile as to Defendants Holmes, Clark, Dahir, Garza, Rafferty, Turner, and Vaughan.

205.     MoneyGram Payment Systems, Inc., a wholly-owned subsidiary of the Company, is party to an agreement with West Interactive Corporation, a subsidiary of West Corporation, under which West Interactive provides infrastructure services for MoneyGram's global customer

contact centers.  Affiliates of THL are the largest single owner of West Corporation's outstanding equity interest and have two representatives on West Corporation's board of directors.  Under the agreement, MoneyGram paid West Corporation approximately $3.4 million in fees for services.  If Defendants Lawry and Rao were to grant a demand, they may fear retaliation against West Interactive Corporation, which would negatively impact the interests of THL.  Thus, demand is futile as to Defendants Lawry and Rao.

206.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

207.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

208.    MoneyGram has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

MoneyGram any part of the damages MoneyGram suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

209.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

210.    The acts complained of herein constitute violations of fiduciary duties owed by MoneyGram officers and directors, and these acts are incapable of ratification.

211.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MoneyGram. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of MoneyGram, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance

Verified Shareholder Derivative Complaint

policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

212.    If there is no directors' and officers' liability insurance, then the Directors will not cause MoneyGram to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

213.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

214.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

216.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

217.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

218.    Under the direction and watch of the Directors, the 2014-2018 Proxy Statements failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

219.    The Individual Defendants also caused the 2014-2018 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

220.    The 2014-2018 Proxy Statements also stated: "All of our directors and employees, including our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions, are subject to our Code of Conduct . . . ." The 2014-2018 Proxy Statements were also false and misleading because, despite assertions to the contrary, MoneyGram's Code of Conduct was not followed, as the Individual Defendants made and/or caused the Company to make the false and misleading statements discussed herein, while

certain of the Individual Defendants engaged in insider trading while the price of the Company's stock was artificially inflated as a result of the false and misleading statements.

221.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014-2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2014-2018 Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

222.    The false and misleading elements of the 2014-2018 Proxy Statements led to the re-elections of Defendants Patsley, Clark, Dahir, Garza, Lawry, Rafferty, Rao, Turner, and Vaughan, which allowed them to continue breaching their fiduciary duties to MoneyGram.[11]

223.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 and 2018 Proxy Statements.

224.    Plaintiff on behalf of MoneyGram has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MoneyGram. Not only is MoneyGram now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the

---

[11] Defendants Clark, Dahir, Garza, Lawry, Rao, Turner, and Vaughan were re-elected following each of the 2014-2018 Proxy Statements.  Defendant Patsley was re-elected following the 2014-2017 Proxy Statements.  Defendant Rafferty was re-elected following the 2017 and 2018 Proxy Statements.

Company itself is also a victim of the unlawful scheme perpetrated upon MoneyGram by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase billions of dollars of its own shares on the open market at artificially-inflated prices, damaging MoneyGram.

227.    During the Securities Fraud Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

228.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MoneyGram not misleading.

229.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by MoneyGram. The Individual Defendants acted with scienter, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the

top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

230.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and/or signed the Company's Form 10-Ks and/or 10-Qs filed with the SEC during the Securities Fraud Relevant Period.

231.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

232.    Plaintiff on behalf of MoneyGram has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Violations of Section 20(a) of the Exchange Act**

233.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.    The Individual Defendants, by virtue of their positions with MoneyGram and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MoneyGram and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MoneyGram to engage in the illegal conduct and practices complained of herein.

235.    Plaintiff on behalf of MoneyGram has no adequate remedy at law.

Verified Shareholder Derivative Complaint

# FOURTH CLAIM

## Against Individual Defendants for Breach of Fiduciary Duties

236.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MoneyGram's business and affairs.

238.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

239.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MoneyGram.

240.     In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Fraudulent Misconduct.

241.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

242.     Also in breach of their fiduciary duties owed to MoneyGram, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company was engaging in the Fraudulent Misconduct; (2) the Fraudulent Misconduct would lead to increased scrutiny from government agencies, including the FTC and the DOJ; and (3) the Company failed to maintain internal controls.

243.     The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

244.     In breach of their fiduciary duties, two of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing over $28.7 million worth of Company stock at artificially inflated prices.

245.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

246.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

247.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

248.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MoneyGram has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

249.     Plaintiff on behalf of MoneyGram has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

250.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

251.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MoneyGram.

252.     The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from MoneyGram that was tied to the performance or artificially inflated valuation of MoneyGram, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

253.    Plaintiff, as a shareholder and a representative of MoneyGram, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

254.    Plaintiff on behalf of MoneyGram has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

255.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

256.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

257.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

258.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

259.    Plaintiff on behalf of MoneyGram has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of MoneyGram, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MoneyGram;

(c)     Determining and awarding to MoneyGram the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing MoneyGram and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MoneyGram and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of MoneyGram to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding MoneyGram restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 19, 2019

Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**

/s/*R. Dean Gresham*
R. Dean Gresham
State Bar No.:  24027215
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com

*Local Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: 4E57EB79-3678-4DAC-8E68-A1F23BDCF51B

## VERIFICATION

I, Khong Meng Chew am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of February 2019.

2/18/2019

Khong Meng Chew